## WILLIAMSON v. LAMB.

### March 1, 1840.

*Rule to show cause why the sheriff's sale should not be set aside.*

Where an executor or administrator is the purchaser at sheriff's sale of the real estate of the decedent, sold on an incumbrance created by the latter in his lifetime, the executor or administrator being the defendant in the execution, the court, on application of the devisees or heirs, made before the acknowledgment of the sheriff's deed, will set aside the sheriff's sale.

THIS was a *levari facias* to September term, 1839, in which Jesse Williamson was the plaintiff, and James Lamb, administrator *d. b. n.* of Arthur Means, deceased, was the defendant. The judgment had been obtained on a mortgage given by the testator. James Lamb, the defendant, was the purchaser at the sheriff's sale. He was married to one of the children of the testator, whose other children, three in number, obtained this rule to show cause why the sheriff's sale should not be set aside.

*Hirst*, for rule.
*J. R. Ingersoll* and *J. S. Smith*, contra.

The counsel cited 1 *Yeates* 307 ; *Williams on Ex.* 625 ; 1 *Bing.* 50 ; 5 *Watts* 303 ; 1 *Binn.* 56 ; 4 *Binn.* 43 ; 2 *Whart.* 53 ; 1 *Rawle* 392 ; *Peters C. C. R.* 378.

The opinion of the court (which fully states all the facts), was delivered by

STROUD, J.—Arthur Means, by his last will and testament, devised to his wife for life the rents, issues, and profits of all his estate, remainder to his four children. The time of his death has not been shown, but his will was proved November 4, 1835, and letters testamentary thereon granted to his widow.

On the 22d of May, 1837, *scire facias* sur mortgage by testator to the plaintiff, dated August 4, 1829, was issued ; and judgment was obtained thereon during the lifetime of Mrs. Means.

February 12, 1839, Mrs. Means died, and shortly afterwards, letters of administration *de bonis non, cum testamento annexo,* were granted to James Lamb, who had married one of the daughters

[Williamson v. Lamb.]

of the testator. A *scire facias post annum et diem*, was sued out against said *Lamb*, as administrator and the terre tenants. The sheriff returned *scire facias* as to *Lamb*, and service appears to have been accepted by *two* of the children of Means, as *terre tenants*.

June 22, 1839, judgment by *default* was taken on the last mentioned *scire facias*.

A *levari facias* was duly issued, and in October 1, 1839, a sale was made under this writ to *James Lamb*, the defendant.

*Three* of the children of Arthur Means, the fourth being the wife of Lamb,) have applied to set this sale aside. *Two* of three reasons assigned by them, have been, very properly, abandoned. The *third* is this: that *James Lamb* the *administrator* and defendant, is the purchaser.

This objection, in its present limited form, is probably, of the first impression, and on account of its novelty and importance, it has undergone two arguments. The principle on which this objection rests, is, that the office of an administrator imposes upon him duties which are in conflict with his interest as purchaser.

An *administrator* is bound to prevent the sale of the real estate, if the personal estate be sufficient to pay the debts of the intestate. And if the personal estate be inadequate for this purpose, he is authorized by the 31st section of the act of 29th March, 1832, " relating to orphans' courts," *Purd. Dig.* 766, to apply to the orphan's court of the proper county, for power to procure on a *mortgage* of the real estate, a loan of money to discharge the intestate's debts, or that court may authorize him to make sale under its process of the real estate for the like purpose.

In times of commercial prosperity, a loan of money on mortgage may be always had, provided the amount required does not exceed half the value of the real estate offered to be pledged. And where the rents of the property exceed in a considerable degree the interest of the loan, this course may be most beneficial to those who are entitled to the estate by operation of law. At all events, such is the theory of the act of assembly, and it is the duty of the administrator, if practicable, to give heed to it. But even where, from commercial gloom, or the extent of the incumbrances, or otherwise, a loan on mortgage is not within the competency of the administrator, I think it may be safely assumed,

[Williamson v. Lamb.]

that a sale by the process of the Orphans' Court is preferable to a sale founded on a judgment of a court of common pleas, by the intervention of the sheriff. The Orphans' Court may, and frequently does direct a sale to be made on *credit*, as to part of the purchase money. This is beyond the power of the sheriff. *He must* sell for ready money. But further, and this is deemed a conclusive view of the subject, it is the plain duty of an administrator, to watch jealously the conduct of the sheriff's sale. He should see that every step taken by the sheriff be in conformity with the rules of law, and that the advertisements, as to description of the property, the time and place of sale, &c. have been framed aright. He should attend the sale, and prevent, if possible, the occurrence of any thing there calculated to depreciate the property. And he is the proper person to apply to the court in case of any irregularity in the conduct of the sale, to set the sale aside. It is no answer to say, that other persons interested in the estate may be heard. They have a right to rely on the attention of the administrator, and then the information in his possession will be used for their benefit, and hence they are not bound to devote their own time to the matter; nor can they always obtain at the proper moment the knowledge of facts necessary to enable them to protect their own interests.

The reason of the rule which forbids a trustee, or any other person having control of the sale of property in which others are beneficially interested, from becoming purchasers of such property, applies with full strength to the condition of an administrator, defendant in the judgment upon which the sale is founded. In Davorce *v.* Fanning, 2 *Johns. C. Rep.* 260–1, *Chancellor Kent* has stated the considerations on which this rule rests, in the following clear and forcible manner. " However innocent," he says, " the purchaser may be in the given case, *it is poisonous in its consequences.* The *cestui que trust* is not bound to prove, nor is the court bound to judge, that the trustee has made a bargain advantageous to himself. The fact may be and yet the party not have it in his power distinctly and clearly to show it. There may be fraud, as Lord Hardwicke observed, and the party not able to prove it. It is to guard against this uncertainty and *hazard* of abuse, and to remove the trustee from temptation, that the rule does and will permit the *cestui que use* to come at his

[Williamson v. Lamb.]

own option, and without showing actual injury, and insist upon the experiment of another sale. This is a remedy which goes deep and touches the very root of the evil."

*Chancellor Kent* has brought together in his opinion a great number of the English decisions, and deduces the conclusion from the comprehensive survey which he takes, that the rule is universal in its application. In more than one instance, it was extended by *Lord Eldon* not merely to individuals standing in the relation of trustees, &c. but to *their legal advisers.* He refused to sanction a purchase *by a solicitor* in a commission of bankruptcy, although publicly made *at auction.* The general doctrine thus asserted is in equal favour in the courts of this state. It is unnecessary to refer particularly to the reported cases. They are all collected, reviewed and approved by the Supreme Court, in the opinion given by *Judge Rogers,* in Campbell *v.* Pennsylvania Life Insurance Company, 2 *Whart. R.* 63, and by *Judge King*, in Wallington's Estate, 1 *Ashmead* 307.

The only expression of a different sentiment which I have any where met with is in Prevost *v.* Gratz, *Peters' C. C. Rep.* 364, which was cited on the argument before us. In that case, *Judge Washington*, after an unequivocal recognition of the rule in regard to *voluntary* sales by a trustee, &c. suggests that a purchase by an *executor* of the *personal* estate of the testator, seized and sold under execution by the sheriff, is not comprehended within the spirit of the rule, because the sale is not under the control of the *executor*, but of the *sheriff*, p. 378. He limits his remark to a sale of *personal* estate, and the extreme rarity of an application to set aside a sheriff's sale of *personal* property, was calculated to withdraw his attention from the *fact*, that it is the *duty* of an executor or administrator, in a case of this kind, to see that the property of the testator or intestate be not sacrificed by any improper conduct of the sheriff. Unquestionably, however, it *is* his *duty*, and not only so, it may be doubted whether any other person could interpose for such a purpose. Highly, therefore, as I respect the opinion of this distinguished jurist, I cannot acquiesce in the soundness of his judgment in this particular case. The point, indeed, did not arise directly there, and most probably, underwent no argument at the bar.

Two other cases have been pressed upon our attention, which

[Williamson v. Lamb.]

it will be proper to notice briefly.    The *first* of these—Lessee of Eichelberger *v.* Barnitz, is reported in **1** *Yeates* **307.** It was there held, that when *two or more* executors sell lands openly, and they are bought by a stranger *for one of them,* such sale is not necessarily *void.* This was a sale under a power contained in a last will. There were *two* executors. The court places its decision solely on the ground that *both* executors had joined in the sale. The language used is, " no decision has been shown, that where *two* or more executors sell lands openly and fairly, and another person buys them for one of them at the full price, such sale has been ruled void. There is a solid distinction in reason between the cases. There are proper checks on the conduct of such *co*-executor in the last instance—it was not in his power merely to conceal a fraud, if one is intended." The other decision— Mackintosh *v.* Barber, 1 *Bing.* 51, (8 *E. C. L. R.* 242,) cannot, I think, be properly said to fall within the rule at all. There were six persons named as executors in the will. *Three* only of them proved the will and received letters testamentary. The *other three renounced.* One of the executors who had *renounced,* having purchased a portion of the property, refused to comply with his purchase, and sought to excuse himself on the ground that he had been named one of the executors in the will, and came within the prohibition that the *seller* could not also be a *purchaser.* But the Court of Common Pleas (it being a case sent for its opinion by the vice-chancellor) certified that the legal estate was well vested in this purchaser, and thus denied his right to rescind the contract with the *three acting* executors.

To guard against all misapprehension, it may be proper to state, that we are not called upon to declare a sale void, in which the purchase-money has been paid and the deed acknowledged in open court, in conformity with the act of assembly governing sheriff's sales. No money has been paid, nor deed acknowledged. The purchaser, too, is the *sole* administrator; and, although *two* of the children of Arthur Means have been treated as *terre tenants* and served with process by the sheriff (which might, possibly, prevent them from objecting to the sale, inasmuch as they could have made defence in the action), yet the *third* child was not made a party at all, and he has a clear right

[Williamson v. Lamb.]

to object to the confirmation of the sale, and, having done so, the sale must be set aside.

JONES, J. dissented.

Rule absolute.