The complainant sued the defendant at law in what, at common law, is known as an action of deceit, for fraud and misrepresentation in the sale of lands. At the trial it appearing to the court that the complainant's remedy, if any, was in equity and not at law, the case was transferred to this court under the Transfer of Causes act. P.L. 1912 p. 417.
In order to present a case according to the procedure in equity, complainant filed his bill, and issue was joined, and the case partially tried, when the complainant asked leave to file an amended bill, which leave was granted and the amended bill filed.
In the amended bill it is alleged that on June 19th, 1916, the defendant entered into a contract with one Henry Stipsitz, agreeing, for the consideration of $6,000, to well and sufficiently convey in fee, by executor's deed, on or before the 1st day of August, 1916, the premises therein described, consisting of twenty-nine lots in the borough of Cliffside Park, in the county of Bergen; that the defendants then and there represented to the complainant, who carried on the transaction with them, that they were the owners of the lands and premises in question, and, in the month of June, 1916, Stipsitz assigned the contract to complainant, and complainant took the same, believing the representations of the defendants. That on the 17th of August, 1916, the defendants delivered to the complainant a certain paper in which they represented that they had well and sufficiently conveyed all of the lands and premises therein described, and because of such representations complainant paid the defendants the sum of $6,000; that defendants had their own legal adviser, and were well informed of the state and condition of their title, and that said representations were false and untrue, and that relying upon said representations, and without knowledge of their falsity, and at the request of defendants, complainant paid the defendants the consideration aforesaid. That, as a matter of fact, at the time of the contract and the conveyance, the defendants were not the owners of lots 41, 42, 43, 44, 45 and 46 in block No. 22 on the map entitled "Map of Grantwood, in the borough of Cliffside *Page 75 
Park, Bergen county, N.J.," made by Alfred E. Williams, C.E., and duly filed in the Bergen county clerk's office on May 1st, 1901, as map No. 805. It is also alleged that on the date of the deed the defendants could have acquired the said lands from the owners thereof, and could have conveyed the same; and complainant is ready and willing to accept such conveyance after defendants should have perfected their title. It also alleges that the defendants refused to convey said lands and premises which, at the time of the making of the contract, were and still are of the value of $5,000. It then alleges that, by reason of said false and untruthful representations, the complainant has suffered loss or damage in large sums of money, to wit, in $200 for fees and expenses, c., in the sum of $1,000 for loss of profits, and that the value of the lands contracted to be conveyed are abated to the extent of $5,000. The pertinent prayers for relief are as follows:
"3. That the defendants execute a deed well and sufficiently conveying said lands and premises.
"4. That the purchase price paid be abated.
"5. That the defendants may be decreed to pay to the complainant his losses and the proportionate value of said lands and premises to which complainant had no title on the 19th day of June, 1916."
The defendants answered the original bill, which answer was allowed to stand as the answer to the amended bill. In this answer all fraud and misrepresentation with which they are charged in the bill defendants deny, and say, generally, that, as executors of the estate, they had no knowledge of the ownership of this property excepting as it appeared in three several sheriff's deeds; that they believed they were the owners, and so informed the complainant; that the contract covered twenty-nine lots; that complainant had the title searched, and it being reported that the defendants were the owners of the twenty-nine lots mentioned in the contract (which included the six lots in question), the deed was made, and, upon the complainant acquainting them with the fact that they were not the owners of these six lots, the defendants offered to take a reconveyance and pay to the complainant *Page 76 
the purchase price, and made a tender as hereinafter stated, but the complainant refused to accept the same.
The facts appearing in evidence are as follows: Carl A. Hansmann, late of the city of New York, died on the 9th day of January, 1916, leaving his will, which was probated in New York county on the 3d day of February, 1916. He owned, at one time, twenty-nine lots at Grantwood, N.J. The complainant, who was a real estate agent, doing business at Grantwood, in the first week in June, 1916, called on Mr. Lowes, a member of the law firm of Rounds, Sherman Dwight, in New York City, and inquired if he represented the Hansmann estate. Mr. Lowes told him that he had been active in straightening out Mr. Hansmann's cases with relation to the interest of his firm in his cases, but he had not had very much to do with Mr. Hansmann's personal affairs or personal investments, and asked him what he could do for him. He said he was interested in some lots in Hudson Heights, N.J., and mentioned no other lots. Mr. Lowes told Mr. Bohm that he had found among Mr. Hansmann's papers some deeds and a memorandum which referred to the ownership by Mr. Hansmann of some lots at Grantwood, N.J.; that he knew nothing about the locality known as "Hudson Heights," and knew nothing about any other lots belonging to Mr. Hansmann than those at Grantwood. He says he went immediately to the office safe and got three sheriff's deeds and showed them to Mr. Bohm, saying that he presumed that that was the way Mr. Hansmann got title to those lots, and that he knew nothing further about it. He told him that this memorandum that was found, made by Mr. Hansmann, had put a value on what he called "the Grantwood lots" at $7,500, and that was all the information he had as to the ownership, or value, or identity, or location of the property in New Jersey that belonged to the testator; that the executors were anxious to sell the lots and asked him what he would give for them; that complainant told him he represented a man named Henry Stipsitz, who was a broker in the New York produce exchange, and that he wanted these lots, and that he was willing to give $6,000 for them. Mr. Lowes said he would transmit his offer to the *Page 77 
executors, which he did; that he made no statement of any kind as to the ownership of the lots, and reiterated to Mr. Bohm that he would not allowed the executors to make anything but an executor's deed, and that they would in no sense warrant the title; that he knew nothing about the taxes or assessments, and that he, Bohm, would have to assume all obligations and pay $6,000 net.
It is quite apparent that Mr. Lowes knew absolutely nothing about the ownership, title or prior conveyance of the six lots above referred to; his knowledge was solely derived from the sheriff's deeds above mentioned.
I may add that the testimony of Mr. Aiken and Mrs. Hansmann, the two executors, indicates that they were unaware of a prior conveyance of these lots. There was evidence to the effect that shortly prior to the making of the contract a mortgage on these six lots, made by the true owner, was paid to the executors through Mr. Lowes, which complainant argues indicates that they had knowledge of the fact that the six lots had been sold prior thereto. Without going into detail, it is perfectly plain to me, from the testimony of the witnesses, that they had no knowledge of the prior conveyance of the six lots; and the testimony of Mr. Lowes makes it clear that the executors would not assume any responsibility for anything that the record of the title might disclose.
After the contract was made the complainant had a search made by a member of the bar of Hudson county of good reputation and considered a careful examiner of titles, who overlooked a conveyance of the six lots described in the bill, made by testator to one Jeremiah W. Davern, of Plattsburg, N.Y., and passed the title on August 17th, 1916, when an ordinary executor's deed with covenant against grantor's acts was delivered — there was no other covenants in the deed.
At the time of the delivery of the deed the complainant made a bond and mortgage to secure the funds, or a part thereof, to pay the purchase price, which mortgage, I understand, is of record, covering the whole premises.
In the early part of January, 1917, the complainant applied at the tax office for his tax bills, and then says he *Page 78 
learned that the above six lots were owned by Davern. He at once communicated with Mr. Lowes, who, during the same month, took the matter up with Mr. Bohm, and, after a discussion with him, believed that $200 would cover his costs and disbursements; and later on, in January, 1917, he discussed with Bohm the idea of giving him $200 and returning the purchase price, with interest. In the meantime he says he had discussed the matter with the man who had examined the title, and that accounted for some delay in the matter. The matter seemed to drift, Bohm being unwilling to accept the offer. On April 17th, 1917, the defendants made an offer, in writing, tendering $6,425 for a retransfer of the premises. The closing language of the tender is as follows: "We know of no other moneys which you can justly or legally demand from us as a condition to the reconveyance of the premises in question to us; but should there be any other legal demand for which we are liable in the premises, we are ready forthwith, upon your acquainting us with the nature and particulars of such demand, to comply with and discharge at once." The tender was made in legal funds.
At the time of the latter offer Mr. Bohm spoke of his having entered into contracts or made conveyance of some of the lots, which would disable him from conveying back all the lots. Defendants then offered to allow the complainant to carry out the contracts, credit to be given them for the contract price, as well as the proceeds of the sale of lots sold, and allow him a commission as agent.
But it appears from the testimony of Mr. Bohm that he does not desire to restore the status quo as nearly as possible by accepting the return of the purchase price with interest and his expenses, because he considered that he had a good bargain, and that the six lots are worth from $6,000 to $6,500, and the remaining lots are of little or no value. As evidence of the value he borrowed $5,500 on bond and mortgage, and only put $500 of his own money into the transaction, plus his expenses. *Page 79 
His appraiser says that the minimum value of the six lots is $4,800, and the value of the remaining twenty-three lots about $5,000.
It is perfectly plain, as above stated, that when the defendant executors disposed of these lots the figure which they accepted was about $1,500 less than the testator's appraisal, but they sold the twenty-nine lots for a lump sum in order to dispose of all their property in New Jersey and settle up the estate. It is also quite plain that if the parties had known that the six lots were not owned by testator at his death the contract would not have been entered into. The defendants, through their counsel, made it quite plain to the complainant — quite as clearly as it might reasonably be expressed — that they did not intend to assume any responsibility on the sale. The complainant did not in any sense rely upon anything said by the defendants or their solicitor to him. He had the title searched, and if the searcher had discovered that the six lots had been sold, then I am inclined to the view that neither party would have desired to carry out the contract.
Under the English cases the complainant would have no right, either at law or in equity, on the case as presented. There was no fraud and no misrepresentation or representation of any kind made by the defendants to the complainant. Any injury which the complainant suffered arose out of his own negligence. Straus v.Norris, 78 N.J. Eq. 488. In this latter case Vice-Chancellor Howell, after stating that after the delivery of the deed, at common law, and the payment of the purchase-money, the grantee had no right of action except upon some covenant or agreement which still subsists as an independent and separate cause of action, and that while none of the New Jersey cases decided reached the question of liability after the consummation of the contract, says: "The reasoning of Chancellor Pennington inCouse v. Boyles, 4 N.J. Eq. 212, seems to establish the jurisdiction of equity, provided a complainant has done nothing which would interfere with his equities accruing from the transaction." Here the complainant knew he was to receive an executor's deed with covenant against grantor's acts, with *Page 80 
no covenants upon which he might sue at law. In this posture he claims the right to come into equity to enforce a right growing out of a situation that he brought about clearly by his own neglect, and a situation that never would have been created, had he informed the defendants that they did not own the six lots in question. This negligence, I take it, may be regarded as doing something which interferes with his equities, because, as above stated, it was his neglect, and not any act, conduct or negligence of the defendants. True, the complainant did not actively do something, but his neglect amounts to the same thing, in that, were it not for his neglect, he would have had actual and not constructive notice. In such a situation the complainant, in seeking equity, must do equity. The defendants have offered to restore the status quo as nearly as possible by paying back the purchase price, with interest, after deducting therefrom the sums received by the complainant on the sale of lots, a thing which he persisted in long after the defendants had made known their position and made the tender. The defendants were also willing to pay the complainant certain expenses, and their offer, to my mind, is fair and equitable.
The decree will be that if the complainant will reconvey the unsold lots, the title to which passed by the executor's deed, excepting those that have been sold, the defendants will be decreed to pay the complainant in accordance with the tender made by the defendants, or if the complainant is unwilling to accept such tender, then the defendants will be decreed to pay to the complainant the sum of $6,000 and interest and the expenses provided by the statute in a case where the failure of performance is not due to the deceit or fraud of the defendant (P.L. 1915 p. 316; 1st Supp. Comp. Stat. p. 472), in either of which cases the complainant shall credit on account of the sums aforesaid the net receipts derived by him from the lots sold, with interest, which several amounts, if the parties cannot agree upon, will be settled on motion.
If the complainant refuses to make the reconveyance upon the foregoing terms, then the bill will be dismissed. *Page 81